```
 1              IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI
                CASE NO. 17-CR-20701-MGC-2
 3   _____

 4    UNITED STATES OF AMERICA,
                         Plaintiff
 5           vs.                        August 22, 2018

 6    RAONEL VALDEZ VALHUERDIS,
                         Defendant.
 7
     _____
 8                    SENTENCING HEARING

 9         BEFORE THE HONORABLE MARCIA G. COOKE,

10         UNITED STATES DISTRICT COURT JUDGE
     _____
11
                    A P P E A R A N C E S
12
     FOR THE PLAINTIFF:    VANESSA S. JOHANNES, AUSA
13   UNITED STATES OF      United States Attorney's Office
     AMERICA               Miami Special Prosecutions Section
14                         99 NE 4th Street, Suite 808
                           Miami, FL 33132
15                         (305) 961-9023
                           Vanessa.s.johannes@usdoj.gov
16

17   FOR THE DEFENDANT:    ANA MARIA JHONES, ESQ
     RAONEL VALDEZ         Haley and Jhones PA
18   VALHUERDIS            9100 S. Dadeland Blvd, Suite 1500
                           Miami, FL 33156
19                         (305) 661-4637
                           Jhonesam@aol.com
20

21   REPORTED BY:          GIZELLA BAAN-PROULX, RPR, FCRR
                           United States Court Reporter
22                         400 North Miami Avenue, 8th Floor
                           Miami  FL  33128
23                         (305) 523-5634
                           gizella_baan-proulx@flsd.uscourts.gov
24
     Also present:
25        Interpreter, Probation Officer
```

<u>P R O C E E D I N G S</u>

*(The following proceedings were held in open court.)*

    **THE COURT:**  We're on record in the United States of America versus Raonel Valdez Valhuerdis.  Appearing on behalf of the United States.

    **AUSA JOHANNES:**  Good afternoon, Your Honor.  Vanessa Johannes.  I'm here on behalf of the Ignacio Vazquez.

    **THE COURT:**  And appearing on behalf of Raonel Valdez Valhuerdis?

    **THE DEFENSE:**  Good afternoon, Your Honor.  ^  Ana Maria Jhones on behalf of Raonel Valdez Valhuerdis, who is present before the Court.

    **THE COURT:**  Today is the date and time set for sentencing.  Spectators and probation may be seated.

    Counsel for the defendant, are you prepared to proceed?

    **THE DEFENSE:**  We are, Your Honor.

    **AUSA JOHANNES:**  Yes.

    **THE COURT:**  I understand that there's some objection to the terms of the calculation in the guidelines?

    **AUSA JOHANNES:**  Your Honor, there is -- from my understanding from AUSA Vazquez -- there is one outstanding objection, and that deals with whether or not the defendant qualifies as a career offender.

    One of the underlying convictions, I believe his

lawyer submits, does not qualify because it was merely a grow

house; however, the provisions take into account maintaining a

place for the purpose of facilitating a drug office and does,

in fact, account for that being qualifying for career offender.

02:38   **THE COURT:**  So you think based on your review of the

guidelines and its commentary that probation correctly pointed

to that particular offense?

**AUSA JOHANNES:**  Yes, Your Honor.

**THE COURT:**  Counsel for the defendant?

02:38   **THE DEFENSE:**  Yes.  Good afternoon, Your Honor.  Your

Honor, with respect to -- I just want to make sure -- I'm

agreeing with the government in that all the objections have

been resolved, and the outstanding objection is the objection

which is found at docket entry 136; specifically, the second

02:38   objection.

And Your Honor, in the guideline, the definition of a

controlled substance offense is found at 481.2 (sic).  And the

government correctly cites to the definition in the guideline

which states that a controlled substance offense is any offense

02:39   under state law which is punishable by at least one year of

imprisonment and, quote, prohibits the manufacture, import,

export, distribution, or dispensing of a controlled substance

or the possession of a controlled substance with intent to

manufacture, import, export, distribute, or dispense -- citing

02:39   to 4B1.2, parenthetical B.

1          That definition, Your Honor, does not comport with the

2    statute -- the Florida statute that Mr. Valhuerdis pled guilty

3    to in the predicate offense in the PSI -- so I can direct the

4    Court -- paragraph 50 of the revised PSI dated July 16th, 2018.

02:40  5          The issue being, Your Honor, Mr. Valhuerdis pled

6    guilty to leasing a place.  And, yes, I agree, that the place

7    that was being leased, the underlying -- that place was being

8    utilized for the manufacture of marijuana.

9          However, on paragraph 50 of the PSI, the definition

02:40  10   under 4B1.1 requires that there's an intent element as to the

11   possession -- possession of a controlled substance with the

12   intent to manufacture, import, or export.

13         And my argument is, Your Honor, that the offense for

14   which he pled guilty to in the State of Florida was leasing a

02:40  15   place.  And there was knowledge that the place was being

16   utilized for the purpose of manufacturing, in this case,

17   manufacturing marijuana.

18         And my argument, Your Honor, to the Court is that

19   under the definition, the elements definition of 4B1.2 is more

02:41  20   restrictive.  There has to be an intent element under 4B1.2

21   which was not found in the statute under which he pled guilty

22   to in the State of Florida.

23         And for that reason, Your Honor, respectfully, I

24   object to that being utilized as a controlled substance offense

02:41  25   for enhancement purposes under the career offender provision.

```
            1          THE COURT:  Counsel for the United States?

            2          AUSA JOHANNES:  Your Honor, if you look at 4B1.2 --

            3          THE COURT:  I have an all guideline book, but I don't

            4   think that analysis has changed.  4?

  02:41     5          AUSA JOHANNES:  Yes, page 395 on my book, Your Honor.

            6   I don't know what version you have.

            7          THE COURT:  No.  Unfortunately mine are not with me.

            8   They're -- I took them home to study something and forgot to

            9   bring them back.

  02:41    10          AUSA JOHANNES:  Do you want a copy of mine?

           11          THE COURT:  No.  No.  No.  If you go to 4B1.2?

           12          AUSA JOHANNES:  And if you read the commentary,

           13   specifically, application notes.  It's under one -- I

           14   understand one is very long.  So let's go down to -- make it

  02:42    15   easier for Your Honor -- the 7th paragraph.  It begins with

           16   maintaining.

           17          THE COURT:  Maintaining any place for the purpose of

           18   facilitating a drug offense?

           19          AUSA JOHANNES:  Correct.

  02:42    20          THE COURT:  Is a controlled substance offense if the

           21   offense of conviction established that the underlying offense,

           22   the offense facilitated was a controlled substance offense.

           23          AUSA JOHANNES:  Correct.  So if you cross --

           24          THE COURT:  And if we look at docket entry number 30.

  02:42    25          AUSA JOHANNES:  Yes.
```

1          **THE COURT:**  That's a controlled substance offense.

2          **AUSA JOHANNES:**  Yes.  That's how I read it.  And if

3   you even read -- and I printed out the Florida statute

4   specifically to which the defendant was convicted of.

02:42   5          It says:  Any person may not own lease or rent a

6   place, structure, or any part thereof, or other conveyance with

7   the knowledge that the place, structure, trailer, or conveyance

8   will be used for the purpose of trafficking in a controlled

9   substance as provided in section 893.135.

02:43  10          If you go to 893.135, it is a state trafficking

11  violation.  So it directly cross references a controlled

12  substance offense.

13          **THE COURT:**  What about counsel's argument that there

14  is no showing of an intent?  Am I understanding you,

02:43  15  Ms. Jhones?

16          **THE DEFENSE:**  You are, Your Honor.

17          **AUSA JOHANNES:**  But the underlying offense has to show

18  that it was a controlled substance based on the notation, Your

19  Honor.  And it is deemed a controlled substance offense.  It

02:43  20  reads the same way.

21          **THE COURT:**  But I think her argument is -- and I may,

22  once again, not be putting it in the same way as she wants it.

23          She's saying that it has to show that he intended to

24  traffic by virtue of the rental.  Now, my argument back,

02:44  25  counsel, would be as a result of the search, the officers

1    discovered 20 pounds of marijuana.  That's way above personal

2    use.

3         What other thing is there to infer even from that fact

4    that there wouldn't be trafficking involved?

02:44  5         AUSA JOHANNES:  Your Honor, if I may, and I think that

6    this would also go to her response.  In the Florida statute --

7    I agree; it doesn't acknowledge that the person convicted

8    actually is the person who's going to necessarily distribute.

9    Of course not, because this is designed to prevent individuals

02:44 10   from knowingly allowing their homes to be used as grow houses.

11        However, that person has, in order to be convicted

12   under the statute, they have to note the place is being used to

13   traffic in narcotics, is being used for a grow house.

14        And specifically, with respect to what Your Honor just

02:44 15   pointed out, the amount that was found in that home, under the

16   statute, the state statute, section 893.135.14 says for the

17   purposes of the section, proof of the possession of 25 or more

18   cannabis plants -- which this was far more -- is prima facie

19   evidence that the cannabis plants were intended to be

02:45 20   distributed.

21        THE COURT:  So the amount under the state statute, the

22   amount creates the inference for intent?

23        AUSA JOHANNES:  That's how I read it, Your Honor.

24        THE DEFENSE:  Your Honor, I could read to the Court --

02:45 25   I have count 1.  I have actually the information of the

1  charging document in the State of Florida to which he pled.

2  And count 1, Raonel Valdez on or about May 10th, 2012.

3              THE INTERPRETER:  Your Honor, I apologize.

4              THE COURT:  I think what the interpreter is going to

02:45  5  ask me to ask you is to remember that these proceedings are

6  being translated, and that if you want your client to have an

7  accurate translation, you're going to have to slow down.

8  They're good; they're not magic.  All right.  Continue.

9              THE DEFENSE:  My apologies.  Again, Your Honor, the

02:45  10  actual count as stated in the information in the State of

11  Florida was that Raonel Valdez on or about May 10th of 2012 was

12  unlawfully and knowingly in actual or constructive possession

13  of a place with the knowledge that said place would be used for

14  the manufacture of a controlled substance intended for sale or

02:46  15  distribution to another in violation of 893.1351, parenthetical

16  2.

17              The gravamen of the offense, Your Honor, is being in

18  constructive possession of a place --

19              THE COURT:  But that -- do I not also look at the

02:46  20  definition section of the statute that counsel just read to me?

21  Counsel for the United States?

22              AUSA JOHANNES:  I have copies of it, Your Honor, and I

23  have a copy --

24              THE COURT:  She just read to me that, yes, that's the

02:46  25  Florida statute.  But then when you look at the Florida statute

1  because if you want to argue an elements analysis, part of the

2  elements is how the statute defines itself.  Correct?

3          **THE DEFENSE:**  Correct.

4          **THE COURT:**  And it defines itself by telling the

02:47  5  reader:  If you have more than X number of plants, the element

6  of intent is met; meaning, the government -- or in that case

7  the State -- doesn't have to prove separately what your mens

8  rea was.

9          **THE GOVERNMENT:**  Your Honor -- and I have a copy for

02:47 10  defense counsel and I can provide one to the Court.  That is

11  prima facie evidence that it was, in fact, intended for

12  distribution.

13          **THE COURT:**  I respect your argument, but I think the

14  statute wins out here in terms of looking at specifically, one,

02:47 15  what he pled to; what the prosecutor in the state was trying to

16  do; and that I understand, counsel, very often when we do the

17  elements analysis, there's no -- there are statutes that don't

18  have a qualifying mens rea; that if you can't prove that there

19  was an intent element, you can't factor that in to the

02:48 20  discussion.

21          But here, the State -- one of the few times the State

22  of Florida actually wrote a good statute -- I'm not saying it's

23  good or bad -- but they actually included in their analysis a

24  definition that allows the Court, lawyers to look back and

02:48 25  determine what was the level of the possessory nature.

1    So I think in paragraph 50, that government has met

2  its burden of proof as to that particular offense, and it

3  adequately points out trafficking in terms of how the statute

4  is interpreted.  Anything else?

02:48  5    **THE DEFENSE**:  Yes, Your Honor.  Not with respect to

6  that issue.

7    Your Honor, with respect to the other underlying

8  offense which I agree -- I have agreed with the government that

9  based on the current state of the law, and specifically I'm

02:49 10  referring to the other underlying predicate offense which is

11  the agg -- the prior State of Florida conviction for aggravated

12  assault with a deadly weapon which is found at paragraph 49 of

13  the PSI, I just wanted to preserve this issue for the record if

14  I may.

02:49 15    I agree with the government that the current state in

16  the 11th Circuit is that aggravated assault with a deadly

17  weapon constitutes a crime of violence under the career

18  offender provision.

19    But, again, just for purposes of preserving this,

02:49 20  since this is such a fertile area of the law that is

21  continually changing, I wanted to cite for record a couple of

22  cases which I believe the Supreme Court has granted cert on, if

23  I may, Your Honor.

24    In V-O-I-S-I-N, Voisin vs. United States at 136

02:50 25  Supreme Court 2272, the Court has left open the issue as to

whether or not reckless behavior, for example, qualifies as a

crime of violence under the statute.

And additionally, Your Honor, with respect to the

issue of whether or not the intentional threat of violence in

02:50   the assault statute in and of itself, whether the

intentional -- whether the assault statute does not require an

intentional threat of violence but instead only requires, for

example, culpable negligence.

And I just want to state this for the record in the

02:51   event that the Supreme Court in Voisin does actually take

action which will be a beneficial result for Mr. Valhuerdis.

And as the Court knows, there's a pending motion in the State

to vacate that plea.  But as it relates to the current state,

aggravated assault with a deadly weapon is a crime of violence.

02:51   And Your Honor, I believe that the objections -- the

government has agreed with my first objection, the government

agrees that that enhancement is not applicable.

THE COURT:  What paragraph?

THE DEFENSE:  The first objection in page -- docket

02:51   entry 136.

THE COURT:  I know but what paragraph in the plea

agreement?  What paragraph in the presentence investigation

report?

AUSA JOHANNES:  34, Your Honor.

02:51   THE DEFENSE:  34.

|   |   |
|---|---|
|   | 1 |

             1          **THE COURT:**  That was the brandishing one?  Now, my
             2   understanding in my talking to the probation officer about
             3   this, they didn't use -- they didn't put brandishing in each
             4   one of the crimes.  Am I correct?  To probation?
    02:52    5          **PROBATION:**  That's correct, Your Honor.
             6          **THE COURT:**  So it wasn't applied to all of the
             7   robberies but only a particular group of the robberies.
             8          And counsel for the United States, are you saying that
             9   the brandishing enhancement doesn't apply to any of the
    02:52   10   robberies that occurred?
            11          **AUSA JOHANNES:**  Your Honor, no.  I think AUSA Vazquez,
            12   he did respond to this, and I do know that his understanding
            13   was that this was applied to the home invasion, specifically,
            14   the act that occurred on September 30th, where a firearm was
    02:52   15   brandished, and there was a shooting as a result of it.
            16          So that is specifically the one that he felt this
            17   would have been double counting.  But I think --
            18          **THE COURT:**  Well, I have that probation counted it in
            19   the group 2, the October 12th robbery, if we're looking at
    02:53   20   paragraph 34.  Paragraph 34 concerns the October 12th robbery.
            21   You're concerned that it was in the September 30th robbery?
            22          **AUSA JOHANNES:**  I think when he agreed to that
            23   objection, that was his understanding, Your Honor.
            24          **THE COURT:**  But if you look above on page 11 which
    02:53   25   concerns group 1, the September 30th robberies --

1        **AUSA JOHANNES:**  Yes.

2        **THE COURT:**  -- those are paragraphs 27 through 31.

3  And unless I missed something, I don't see that enhancement in

4  group 1 robbery.

02:53  5        **AUSA JOHANNES:**  That's correct.

6        **THE DEFENSE:**  That's correct, Your Honor.

7        **AUSA JOHANNES:**  So the government would concur with

8  probation.

9        **THE COURT:**  So I think, Ms. Jhones, that paragraph 34

02:53 10  brandishing as it relates to the October 12th robbery, that

11  enhancement is correct.

12        Now, if we got into the facts of the group 1

13  robberies, it might be different.  But as to the group 2

14  robbery October 12th, the brandishing is appropriately counted.

02:54 15        **THE DEFENSE:**  My understanding, Your Honor, under 2 --

16  I believe it's 2K2.4, the commentary that because this is a

17  Hobbs Act conspiracy and we have a 924(c) count, my

18  understanding was that the enhancement provision was not

19  applicable.

02:54 20        **THE COURT:**  2K?

21        **THE DEFENSE:**  2K2.4.  If I may just grab my guideline

22  for a second, Your Honor.

23        **THE COURT:**  If a sentence under this guideline is

24  composed in conjunction with a sentence for an underlying

02:54 25  offense, do not apply any specific offense characteristics for

possession, brandishing, use or discharge of an explosive

firearm when determining the sentence for the underlying

offense.  A sentence under this guideline accounts for any

explosive or weapon enhancement for the underlying offense of

02:55  5  conviction, including any such enhancement that would apply

based upon conduct for which the defendant is accountable under

1P1.3.

8        Do not apply any weapon enhancement in the guideline

9  for the underlying offense if -- and it goes through, but I

02:55  10  don't see anything for 2B3.1.  To probation?  Can you assist

11  the Court, please?

12        PROBATION:  Your Honor, my understanding is that in

13  this case, because count 4, the brandishing count in the

14  indictment, specifically refers to the September 30th robbery,

02:56  15  that that would be the underlying offense, and that's why I

16  didn't apply it for that particular group.  But the indictment

17  didn't refer to the October 12th robbery in that count.

18        THE COURT:  So because the government indicted them

19  separately, you grouped them separately for groups of pointing.

02:56  20  It's not like you didn't apply -- that's why you didn't apply

21  it to the September 30th but separately to the October 12th?

22        PROBATION:  Yeah, that's correct, Your Honor.

23        THE DEFENSE:  And Your Honor, my understanding is in

24  the middle of the paragraph, the weapons enhancement

02:56  25  application note 4, do not apply any weapons enhancement in the

1  guidelines for the underlying offense, for example, if the
2  co-defendant is part of jointly undertaking criminal activity
3  possess a firearm different from the one for which the
4  defendant was convicted under 18 USC 924(c).

02:56   5       And Mr. Valhuerdis has pled guilty to the Hobbs Act
6  which encompasses two robberies.

7       **THE COURT:**  But what if you go to the end of that
8  paragraph, would that not -- they use the bank robbery as the
9  analysis, as opposed to Hobbs Act robbery.

02:57  10       However, if a defendant is convicted of two armed bank
11  robberies but is convicted under 924(c) in connection with only
12  one of the robberies, a weapon enhancement would apply to the
13  bank robbery which was not the basis for the 18 United States
14  Code 924(c) conviction.

02:57  15       **THE DEFENSE:**  I understand, Your Honor, but, again, in
16  this particular case, because the offense is the Hobbs Act
17  conspiracy and the conduct involved in the Hobbs Act conspiracy
18  as opposed to separate robberies, I believe -- and it's not
19  entirely clear -- but I believe that the example in the middle
02:57  20  of that paragraph is applicable here.

21       **THE COURT:**  We're going to have to disagree on this
22  one, unless counsel for the United States, you have -- do you
23  think it's the middle of the paragraph or those last two
24  sentences?

02:58  25       Do we treat this -- sounds to me like a robbery where

1   there's two separate -- I think what they will be talking about

2   -- and Probation, once again, can provide the Court assistance

3   -- where the indictment may have charged the conspiracy count

4   and the substantive robbery count.  But here, we have

02:58   5   conspiracy counts and separate substantive counts that are not

6   part of the conspiracy?

7       **AUSA JOHANNES:**  Your Honor, if I may, I think -- I

8   understand defense counsel's point, and I believe -- I'm

9   looking at the indictment and the way that it's charged.  And I

02:58  10   think to be cautious, so that we are not revisiting this before

11   the 11th Circuit, I don't think the enhancement applies because

12   the conspiracy range charges -- and I believe this is count's

13   point.

14       The range of the conspiracy charges is a very broad

02:59  15   range, and it doesn't cross reference which specific

16   substantive count it charges.  And the way that this case was

17   pled out, it was pled just to the conspiracy, and to

18   Probation's point, the Hobbs Act firearm possession for the

19   September case.  However, one could argue that that conspiracy

02:59  20   range did, in fact, encompass the other robbery.

21       **THE COURT:**  So because the substantive charge for the

22   October 12th robbery, if I read the guideline the way counsel

23   for defendant would want to read them, that that conduct must

24   merge.  So if there was a separate substantive case for which

02:59  25   he pled to October 12th, then that last sentence applies.  But

1  he pled only to the conspiracy.

2       **AUSA JOHANNES:**  That's right.

3       **THE COURT:**  All right.

4       **THE DEFENSE:**  I believe -- and thank you, Vanessa.  I

02:59  5  believe that -- Mr. Vazquez and I had this discussion before, I

6  believe that's why he agreed that the enhancement should not

7  apply.

8       **THE COURT:**  All right.  So paragraph 34, based upon

9  the way this case pled, I will not apply it to the defendant.

03:00 10       And then to probation, does that change his guideline

11  calculation at all?

12       **PROBATION:**  It does until you get to the actual

13  chapter for enhancement because he's a career offender, it will

14  ultimately go up to a level 32; however, at paragraph 40, that

03:00 15  would change to a 24.

16       **THE COURT:**  Paragraph 40 becomes a 24.

17       **PROBATION:**  41 would be plus 0; however, again,

18  because of the career offender enhancement, he would remain a

19  level 32, minus three points for acceptance.

03:00 20       **THE COURT:**  So 42 still comes to 32?  Or 30?

21       **PROBATION:**  Paragraph 42 would be 29 -- I mean, sorry

22  24.  Paragraph 43 would still remain 32.  And 44 to 46 would

23  remain the same.

24       **THE COURT:**  So he still has a total offense level of

03:01 25  29?

1          **PROBATION:**  That's correct, Your Honor.

2          **THE COURT:**  And a criminal history category of 6,

3    which means we're still talking about the combined guideline

4    range of 262 to 327 months.

03:01  5          **THE DEFENSE:**  Yes, Your Honor, if you apply the career

6    offender provision.

7          **THE COURT:**  Now, there's -- the count 4 sentence has

8    to run consecutive to anything in count 1.  So the only -- at

9    this level, the only guideline range sentence that I have

03:01 10   Booker discretion over is count 1.

11         **AUSA JOHANNES:**  That's correct, Your Honor.

12         **THE DEFENSE:**  That's correct, Your Honor.

13         **THE COURT:**  So proceed knowing the limits of the

14   Court's abilities.

03:01 15         **THE DEFENSE:**  Thank you, Your Honor.  Your Honor, as

16   the Court knows, the Court is very familiar with this case.

17   The Court, I believe, has already sentenced two individuals,

18   including the lead defendant, Mr. Lara.

19         **THE COURT:**  And I gave Mr. Lara 219 months?

03:02 20         **PROBATION:**  That's correct, Your Honor.

21         **THE COURT:**  So if Mr. Lara is the most culpable of the

22   individuals involved in this Hobbs Act conspiracy, every one

23   else, unless there's something else that I'm certain counsel

24   for the United States will point it out to me, would be less

03:02 25   than 219 months?

1        **AUSA JOHANNES:**  I believe that's the argument.

2        **THE COURT:**  Okay.  All right.  We're at least

3   partially on the same sheet of paper.  Counsel?

4        **THE DEFENSE:**  Your Honor, very briefly, because

03:02  5   Mr. Valhuerdis wants to address the Court, as does his mother.

6        Just very briefly, Your Honor, I have previously

7   submitted a brief sentencing memorandum.  And just to elaborate

8   a couple of points, Mr. Valhuerdis, for the first 27 years of

9   his life, led nothing short of an exemplary life.

03:03  10        He resided in Cuba.  He received a sports scholarship

11   for wrestling.  He received countless awards for his

12   participation in wrestling.  In my exhibit, my docket entry

13   139, I attached as composite exhibit B just a few of those

14   awards.  There were too many to list.

03:03  15        Also, in composite exhibit A, I presented five

16   character reference letters from his sister -- all of these

17   people were people -- are people that resided in Cuba, people

18   that Mr. Valhuerdis did not have the benefit of their guidance

19   once he immigrated to the United States in 2005.

03:03  20        And among the people in composite exhibit A, besides

21   his sister, is also his former wrestling coach, Nelson Acosta.

22   And Mr. Acosta, Your Honor, if I may just highlight a couple of

23   things that Mr. Acosta has said, and he has known Raonel

24   technically for his entire life until he came in 2005.

03:04  25        He spoke about the talent that Raonel had for the

1   sport, how he was dedicated to the sport, that he was a

2   respectful student, affectionate; he was honest, enthusiastic,

3   cooperative, and really loved belonging to the student body.

4           Officially, Your Honor, there was a letter submitted

03:04   5   by a lifelong friend, Geraldo Pérez Milan, who talked about how

6   it was Raonel, not his own children, when this gentleman

7   retired in Cuba, and he was able to acquire a piece of

8   uncultivated land.

9           And Mr. Pérez Milan spoke about how it was Raonel who

03:05   10   volunteered after his own children said they could not help

11   their father cultivate this land in retirement because it

12   involved work that was just too hard.

13          And Mr. Pérez Milan states:  It was Raonel who gave me

14   the support and began to cultivate this land with me.  As a

03:05   15   young man, Raonel always wanted to better himself.  And at the

16   same time, he cultivated this land which was very hard work.

17          He enrolled in leather goods school, and he also

18   dedicated himself to making shoes so he could generate some

19   income in Cuba.  And, in fact, he stated about -- he talked

03:05   20   about the good reputation that he gained by virtue of his

21   ability to make these shoes.

22          And Your Honor, the facts of this case are very

23   serious, and there's no denying that.  What happened to Raonel

24   for the five years that he involved himself in this conspiracy,

03:06   25   and, in fact, his participation ended in late 2013 when he was

1    arrested.  He had nothing to do with the other count -- the

2    other counts in the narcotics counts in this indictment, and

3    his involvement cannot be compared to the involvement, as

4    previously stated, to Mr. Lara.

03:06    5         It really is inexplicable that Raonel finds himself

6    before the Court.  And I'm going to leave it to him because his

7    allocution -- he wants to allocute to the Court, and it's a

8    little bit more lengthy than I think the typical allocution

9    because he has shared it with me.

03:07   10         A couple more points, Your Honor, with respect to the

11   career offender provision.  Mr. Valhuerdis pled guilty in the

12   State of Florida to one of the underlying robberies.  He

13   received a sentence for ten years in the State of Florida.  In

14   fact, was serving his ten-year sentence for one of the

03:07   15   underlying robbery in the Hobbs Act conspiracy in count 1 when

16   he was writted over to the federal system for prosecution.

17         Mr. Valhuerdis' rehabilitation began in 2014, Your

18   Honor.  And it has continued since then.  And with that, if I

19   may, I would like Mr. Valhuerdis to address the Court and

03:07   20   briefly his mother.

21         **THE COURT:**  Sir?

22         **THE DEFENDANT:**  Good afternoon, Your Honor.  Good

23   afternoon to all those present.  Your Honor, it's very

24   difficult for me to go through this situation.  And for me to

03:08   25   understand how I was able to commit so many crimes, with a past

1    that was so impeccable as the past that I had, and I was

2    dedicated fully to sports before I came to this great country,

3    a country to which I owe a huge apology.

4            Today I cannot do any other thing but to reproach

03:09    5    myself for having failed my parents who have suffered so much,

6    to betray the love of my children who need me so much, and most

7    important, for not having respected the peace of those people

8    who are innocent.

9            And I spend nights awake and I spend time like a

03:09   10    zombie walking in my cell wanting to go back to the past and do

11    things differently, but that will not be possible.

12            I don't know if I was a victim of having matured too

13    late.  I don't know if I was a victim of movies that have such

14    violent contents.  And I don't know if I was a victim of

03:10   15    bullying when I went to the movies, and I was bullied because

16    of my clothing that I wore which was clothing that was cheap.

17            And I don't know whether it was because I came to know

18    evil, evil that I really should have never gotten to know.  But

19    something I do know, Your Honor, and that is that a day does

03:10   20    not go by when I am not very repentant and remorseful for the

21    violent actions that I committed.

22            Some time ago in Cuba, a bicycle was stolen from my

23    nephew -- my niece.  Correction:  My niece.  She was such a

24    lovely young child that should have never had had to suffer

03:11   25    that.  I felt so much pain knowing that she cried for her

bicycle, and it was impossible for me not to place myself in

that situation as my victims and the victims throughout the

actions.  It's really devastating.  Nobody deserves to be a

victim of a crime.

03:12  5        I believe that criminals do not and cannot imagine the

pain that they bring onto their victims.  They would change

their ways of acting and doing things, if a loved one had to go

through such a bitter experience.

       It pains me, and it hurts me not having understood

03:12 10 this before.  I should have never done what I did not like what

was done to my niece.  It took me almost 35 years to understand

this, but I finally did understand.

       And that's how I was able to show this before I was

arrested in Belize.  At that time, I was living in Nicaragua.

03:13 15 And at that time I was just dedicated to traditional mining.  I

did not get involved in any type of crime, despite the fact

that it was offered to me to do so.  And that is the reason why

beyond having been able to challenge what was fair, is not have

loved innocent people as myself.  Everybody deserves to be

03:13 20 respected.

       In every one of those victims, I now see the sad face

of my niece.  And that is why I am so remorseful for having

committed crimes.  I understand that you cannot live trapped in

the past, it's unavoidable for me to not torment and suffer

03:14 25 myself.

1          I'm very remorseful for having allowed this

2    mischievous acts that I committed -- allowed to be committed.

3    I do not believe that I am a dumb person.  I know the

4    difference between good and evil.  And I cannot describe what I

03:14   5    feel for allowing that my frail intelligence was dominated by

6    greed.

7          I do acknowledge that I have used drugs and alcoholic

8    beverages, I do believe that my problem was not due to drugs.

9    My problem was ambition for money.  It's hard to say so, but I

03:15  10    believe that identifying the problem is a good start in order

11    to be able to identify the problem.

12          That ambition was so evil that it took over my

13    innocence.  I now realize that there are many ways to be

14    successful without necessarily committing crimes.  That is

03:16  15    something that I wish that young people could understand.  And

16    that is something that I will be able to show myself and to

17    show others if you allow me the opportunity one more time.

18          I don't know how I was able to disappoint my parents

19    and not follow their values.  They always gave me a lot of

03:16  20    love, love that I missed so much when I came literally just by

21    myself to this country.  They educated me with their love from

22    their heart.

23          I never even heard a bad word come out of their

24    mouths.  I never saw any action on their behalf or by them,

03:17  25    anything that would shame them.  They were always hard working,

1   very happy, and even though they had a simple life.  They never

2   complained about poverty because their values were above that.

3         And Your Honor, look at me now.  Because of my

4   behavior, I am not sure if I will be able to ever see my father

03:17  5   again who is at this time 71 years old.  I am so sorry.

6   Forgive me.  I have not been your perfect son, but I love you

7   from the bottom of my heart.

8         Your Honor, my parents have always set good examples

9   for me, examples that I should have followed.  And that's why

03:18  10   now I feel like a coward, a coward that was not able to fight

11   the temptations that you come up to face to face in life.

12         I truly did not measure the consequences.  And I'm not

13   referring to the consequences of being imprisoned.  I'm

14   referring to the consequences brought about by being a father

03:19  15   who will be in prison and absent, and the consequences of not

16   being able to raise a child.

17         And even more so when you read an article which states

18   that 70 percent of children of parents who are imprisoned will

19   end up in jail as well.  Just thinking of this, I believe that

03:19  20   that guilt would kill me.  I feel the shame for not being

21   strong against adversity.

22         Nothing of what I'm saying justifies what I did or has

23   given me a right to do what I did.  I now recognize and I have

24   to acknowledge that at times I reflected of my excess desire

03:20  25   and ambition to have money.  I was concerned for that feeling

that I got when I realized that I had such ambition that took

me to county jail on several occasions for several days.  But

nevertheless, I did not seek help or psychological assistance.

And I don't know if truly exists, I avoided that, and I just

03:21  5  had other initiatives to do other activities.

Now it's different.  I have not just been in prison

days.  I have been in prison now for almost five years.  And

believe me, Your Honor, that now I have touched bottom.

I don't know now if just being forgiven is enough to

03:21 10  make amends to my mistakes, because they cannot be erased.  I

don't know if this shame that I feel can help the victims that

I cannot really -- that pain cannot really be healed.

But I can tell the victims that I have no words to

describe the shame that I feel and the torture that I feel

03:22 15  knowing that I caused so much pain.  Just my sleepless nights

can tell you how much I recriminate myself for what I have

done.

I can assure you, Your Honor, that that is a lot worse

than any punishment that you may give me.  I understand that I

03:22 20  have to pay a high price for my crimes, but most important is

what can I do different so that I cannot and will not cause any

more hurt to society.

Even though it may seem a little late but if I could,

I will continue looking to reach my dreams until I reach them.

03:23 25  I finally know what I would like to do.  I actually have always

1    known, something that I thought it was an unreachable dream.

2           Now, despite the fact that I'm in prison, my

3    expectations are more beyond that reality.  I have decided that

4    I am going to dedicate myself to the world of entertainment,

03:23  5    and I pass time in prison writing, and I will take courses in

6    camera use, and to be a TV and movie producer.

7           And that is the only way that I will be able to find

8    true peace and will take me away from all negative thoughts

9    because many days when negative thoughts and feelings are very

03:24 10   impossible to eliminate, I am convinced that at least I can

11   replace them.

12          In other words, if previously I committed very

13   reproachable crimes, and now I will be able to just denounce

14   them with courage to all of my victims, and prosecutor, and the

03:25 15   agents, and my esteemed lawyer, and my loved family, and to

16   you, Your Honor.  I can assure you that I will get an

17   education, I will sure you that I will work, and I can assure

18   you that I will pay all my victims until up to the last penny

19   in restitution.

03:25 20          Perhaps in that way I can somehow alleviate the pain

21   that I caused.  And those who I did not steal from, but I made

22   them go through a difficult situation and hurting them

23   emotionally and leaving them with scars that cannot be erased.

24          **THE COURT:**  Excuse me for one moment, sir.  Ivan, I

03:26 25   apologize, sir, you may continue.

**THE DEFENDANT:**  Maybe for some, my apology are just words.  Maybe they do not know how to forgive.  It's possible that they could even respond saying that I should have thought about it before doing it.  And that now it's time to assume the consequences.

Although I understand that it is difficult to convince those lucky ones that have never committed a crime, I can assure you that in my humble opinion that a man is more than a criminal.  And I am an example of what I'm saying.  Because despite in spite of the violence in my own life, I am a sentimental, emotional person, capable of feeling deeply in my soul when I watch on TV immigrants that are separated, fathers and mothers separated from their children.

It was those feelings in the most horrible moments of my life as a criminal that came out from the very deepest part of my soul.  The great compassion and sensitivity in a given moment saved the life of a person.  And it's not that I'm saying that.

Just a short time ago -- and I don't know if this was a mistake or if it was done intentionally -- but they put that person with me in the same unit, the same cell.  Everyone thought that we would fight, but the complete opposite occurred.  That man came up to me, and he thanked me for having saved his life.

That's why I insist, no matter how many crimes I may

have committed, a criminal is actually a human being who has

committed a mistake.  It's logical that one must answer to

justice.  But there's always many more positive things than

negative.

03:30    I can feel love, compassion, sensitivity, respect, and

above all else, I very much regret what I did.  And how can I

demonstrate this other than collaborating with the prosecution.

And that's what I did.

    With all due respect, Your Honor, a man who has

03:30  committed a heinous criminal act, more than receiving a severe

sentence, he is also deserving of having a world of hope, of

living in a world of hope.  Thank you very much and may God

bless you in your decision.

    **THE COURT:**  Counsel, anything else?

03:31    **THE DEFENSE:**  If I may just have a moment, Your Honor.

    Your Honor, with the Court's permission,

Mrs. Valhuerdis would like to address the Court briefly.

    **THE COURT:**  She may step to the podium.

    **THE DEFENSE:**  Thank you.

03:32    **MRS. VALHUERDIS:**  Good afternoon, Your Honor, good

afternoon to all those present here.  Today it's difficult for

me to find myself in this situation.  I'm so ashamed to find

myself in front of you.  To hear the mistakes made by my son,

Raonel Valdez Valhuerdis here in the United States, the country

03:33  that welcomed him, after on several occasions I found myself in

1    front of a jury in Cuba, to recognize his achievements that he

2    accomplished as an athlete.

3        It's important to mention that all of these things in

4    the medals that he won, both nationally and internationally,

03:33    5    and that his defense attorney Ana Maria Jhones has in her

6    possession.

7        To express to you that what I'm going to communicate

8    to you, I don't do this with the intention of getting in the

9    way, in terms of the decision that you're going to make in this

03:34   10    case.  But I do do it with the intention of making you aware of

11    where Raonel Valdez Valhuerdis comes from.

12        Raonel Valdez Valhuerdis was born and was raised in a

13    small village in the country from the Havana province,

14    Mayabeque, which currently is called San Nicolas.

03:35   15        In the village he has been respected and loved by all

16    of the residents and people close to him.  He studied in a

17    municipal school up until the fourth grade in San Nicolas.  He

18    was transferred to a provincial athletic school in the village

19    of Cangrejera in Havana Cuba.

03:36   20        And from there in the ninth grade he started studying

21    in a school in Cordoba Habin (ph.) in Havana, Cuba.  He comes

22    from a Cuban family, humble, hard working, educated, and

23    honest, and professionally prepared.

24        His father got up to a vocational degree in hardware,

03:36   25    and he worked in the Tomolima Center (ph.) in the municipality

1    of San Nicolas in the sugar -- central mill.  He was respected

2    by everyone.  I, his mother, Nuri Cristina Hernandez, I got a

3    degree to assist as an occupational speech therapist to assist

4    children with speech issues, behavioral issues, psychological

03:37    5    disorders, working in the health and educational field for 50

6    years since my title was good in both fields.

7         Here I did a master's degree -- from there I did a

8    masters degree in educational science, loved and respected by

9    everyone.  And having given my son, Raonel Valdez Valhuerdis,

03:38    10    an appropriate education.

11         Raonel Valdez Valhuerdis was taught from the very

12    beginning, values, education, respect, manners, respect,

13    honesty.  This happened day after day.  Stable, up until the

14    time that he left the country.  He was a respectful man,

03:39    15    honest, caring, well mannered, and without criminal history in

16    Cuba, very beloved and respected by our community.

17         The only situation that he was going through was that

18    he wasn't in agreement with his principles.  To explain to you

19    Your Honor, that my son, Raonel Valdez Valhuerdis leaves the

03:40    20    country of Cuba and comes here -- arrives here in the United

21    States, going down a good path.

22         He had work, a job.  His behavior was appropriate, but

23    from one moment to the next, he found himself outside of the

24    protection of his family, outside of our protection, and our

03:41    25    guidance as parents, which facilitated dishonest people take

1   him down an incorrect path.

2          I'm not blaming anyone.  He came when he was 28 years

3   old.  But he was still under our protection, under our

4   guidance, and under our care.  He came to this country with the

03:41   5   dream of having -- of making a better world.  And when he got

6   together with these people, he took the easiest path, and he

7   left the correct path that his parents and his family had

8   taught him.

9          He admits this through his words.  And I understand

03:42  10   that he must very much regret what he did.  His attitude led

11   him to committing mistakes that have no justification, ending

12   the education that we had given him as his parents, losing in

13   this way his moral path, and turning himself into what he is

14   today.

03:43  15          I got to this country in 2013 with him being detained,

16   being in custody in Belize because I belonged to the National

17   Commission of Human Rights in Cuba.  Said commission came to an

18   agreement with the international commission, and I was invited

19   so that I could see him in Belize and help him up until this

03:43  20   moment.

21          I believe that I am here, and I've been able to help

22   him, providing him with an appropriate emotional state, as well

23   as elements related to his upbringing and to his education.

24          My goal with my intervention is not to ask that he be

03:44  25   freed because of these mistakes.  No, not at all.  But justice

1   in the process, taking into account that he has two children

2   that need his protection and his parents who are old.

3          For which justice may be served -- so that justice may

4   be served what he said in his writing must be reflected, and he

03:45  5   must lead an honest life, respect and consideration for this

6   country, for his parents, and for his family.

7          Now that he has incarcerated and that he regrets his

8   actions he has begun to write stories, novels, songs.  Today we

9   had brought a story for you, but we weren't able to have it

03:46  10   finished because the proof reader was not able to finish it,

11   but we hope that at some point we can get it to you, if you

12   would allow us to today, I can read it.  It's a song from him

13   entitled my son.

14          **THE COURT:**  I have enough information, ma'am.  Please

03:47  15   continue to finish.

16          **MRS. VALHUERDIS:**  With this, I finish.  Thank you very

17   much.

18          **THE COURT:**  Thank you.  Counsel for the United States,

19   do you have anything else to add?

03:47  20          **AUSA JOHANNES:**  Yes, Your Honor.  Your Honor, with all

21   due respect, the government's position is that this defendant

22   be sentenced at the low end of the guidelines.

23          Given his personal characteristics and the nature of

24   the offense, the government is not in a position to ask for a

03:47  25   downward departure or a variance.

1          I will admit, Your Honor, I was not the prosecutor on

2   the case earlier before, 1:00 o'clock p.m., so I did not have

3   access the PSIs.  I do not know Defendant Lara's personal

4   criminal history or his personal characteristics which resulted

03:47  5   in the sentence of 219 months.  But the government in my office

6   is not in a position to ask for a departure or a variance.

7          With respect to this defendant, Your Honor, I will

8   state this.  3553(a) requires the Court to make a difficult

9   balance, and it's a balance between the defendant's

03:48  10   characteristics, the offense, and other factors.

11          With respect to the defendant's characteristics, I

12   understand that his family has provided the Court with letters,

13   and obviously his mother just spoke, stating that he was really

14   a stellar individual prior to 2005; that during his time in

03:48  15   Cuba and his upbringing, he was a perfect example of a human

16   being who didn't commit a crime and was a wonderful, wonderful

17   man.

18          Sometimes a person's family, Your Honor -- and we see

19   this quite often unfortunately in court -- does not know that

03:48  20   person very well outside of the family structure and the family

21   environment.  I will tell you and, you know, obviously the

22   government has no way to vet the defendant's criminal actions

23   in Cuba.

24          But I will tell you that the person that his sister

03:49  25   described in her letter and she described him as a, quote,

1    tender and generous soul, a kind soul that is pure and clean,

2    is not the person that we have seen in the United States of

3    America.

4                Since the defendant arrived here in 2005 not as a

03:49   5    young child, not as a little baby, not as a little boy, but as

6    a 28-year-old man, he has had no respect for our country and no

7    respect for the citizens of this community.

8                And that is not the fault of this specific crew that

9    he was committing crimes with which constitute the underlying

03:49   10   offenses because when he was 29, less than two years after

11   arriving in the United States, he started possessing marijuana.

12   He was convicted of that.

13               Less than a year later, he committed aggravated

14   assault with a deadly weapon against two loss prevention

03:50   15   officers at Home Depot who were trying to retrieve garden

16   shears that he stole from Home Depot, and he took those garden

17   shears and became violent with them.

18               Two years after that, possession -- and that was what

19   we discussed earlier, Your Honor -- possession of, essentially

03:50   20   a grow house, a grow house that contained a lot of marijuana.

21               That same year, battery against a female.  That female

22   is the mother of his child.  That same year, driving under the

23   influence.  And then he moves onto the instant offense.  These

24   are just the convictions.  He has other arrests.

03:50   25               So I understand that he has stated he's a

1   compassionate, loving individual, but frankly, since he's been

2   in our country, that's not what he has been.

3           Now, I want to look at the nature of this specific

4   offense.  And I think that given the defendant's statements,

03:51  5   this requires the government to point out:  The two offenses

6   the defendant was involved with are not -- you know, Mr. Lara

7   and others in the crew were involved in cocaine purchases from

8   undercovers.

9           The two that he was involved in are the most violent.

03:51 10   This defendant along with two other individuals -- excuse me,

11   three other individuals attempted to commit a home invasion

12   robbery of what they thought was a grow house on September

13   30th, 2012.  Well, they got the house wrong, which is what

14   always law enforcement's fear in these home invasion cases; is

03:51 15   that they get the house wrong.

16           They did get the house wrong.  And instead of going

17   into a marijuana grow house, they cut the breakers to a private

18   family -- it could have been your house, Your Honor, it could

19   have been my house, it could have been anybody's house here.

03:52 20           They cut the breakers to that family's electricity.

21   The house was dark.  The mother looks outside, sees individuals

22   in the driveway.  She gets very worried; tells her little minor

23   daughter to call 911.

24           Now, that call is very disturbing.  That call reveals

03:52 25   that a child, a little girl is calling on the phone yelling and

1    screaming that she thinks something is wrong.  Why?  Because

2    while she's calling 911, these individuals break into her home,

3    point a firearm at her father, who we all should be somewhat

4    grateful for, is armed himself, and he shoots one of the

03:52   5    defendants.  The co-defendant, who became paralyzed as a result

6    of that, is scheduled to go to trial on September 17th before

7    Your Honor.

8         Now, the little girl does not realize that it's one of

9    the assailants that is shot.  And on the call, she's screaming

03:53  10    to the 911 respondent that her father has been killed, because

11    there's blood everywhere.  Very traumatizing event.  Horrific

12    event.  They leave the home.  They realize they're in the wrong

13    place.

14         What does this defendant do?  Does he think about his

03:53  15    niece and her stolen bike as he's told us all the story of?

16    Does he think, wow, this is really awful; I can't believe I

17    went into the wrong house, and I can't believe a friend of mine

18    was shot and is now paralyzed?  I can't believe that I would do

19    something like this?  I'm a more compassionate person, as he's

03:53  20    told all of us he is?

21         No.  He goes on, less than a month later, on October

22    12th, 2012, to rob, at gunpoint, a gold courier for gold that's

23    worth more than $2,000,000.

24         This is not an individual that's the victim of, as he

03:54  25    has professed violent movies or bullying as a child.  This is

1  not someone who is a stellar example of a man who has come to

2  this country grateful for what this country has provided him.

3  This is an individual who has a violent streak based on his own

4  actions and his own responsibility.

03:54  5       I know he's blaming the crew, and he's blaming bad

6  influences, but he was 33 years old, Your Honor, when he

7  committed the instant offenses.  When you're a 33-year-old man

8  and you've been in the United States for quite a few years and

9  you have had encounters with law enforcement, you know better

03:54  10  and you do better.  And this is not what you do.

11       These are not small crimes to which he finds himself

12  in federal court.  He finds himself in federal court because a

13  home invasion went wrong, and he could have killed a family.

14       He finds himself in federal court because he decided

03:55  15  to steal over $2,000,000 worth of gold from a gold courier,

16  armed, which could have also gone wrong, which we have seen

17  plenty of times in federal court.  He's lucky that didn't

18  happen in that case.

19       So with all due respect to the defendant's background

03:55  20  and his family, which I understand think of him as a different

21  person than he clearly is, he is a violent individual based on

22  the actions he's committed, and he's an individual that finds

23  himself in a guideline range that is quite high, but it's on

24  par with what he has done.  And it's on par with his own

03:55  25  personal characteristics and the nature of the offense.

1          The government respectfully requests a sentence at the

2     low end of the guidelines at 262 months.  And I will point out,

3     Your Honor, that in terms of deterrence, this case is an

4     example of exactly why the federal government does

03:55  5     reverse-sting operations.  This is precisely why the government

6     does reverse-sting home invasion operations:  Because we have a

7     crew here who went into the wrong house, and they could have

8     killed a family.  And it's cases like this that have to set the

9     precedence for why crews should not do this.  Period.  Thank

03:56 10     you.

11          **THE COURT**:  I'd ask the defendant to stand.  After a

12     careful review of the record and the arguments of counsel,

13     including the statements of the defendant and his family in

14     this case, I will be sentencing this defendant slightly outside

03:56 15     the advisory guideline range.

16          It is the judgment of the Court the defendant is

17     hereby committed to the Bureau of Prisons for 214 months.  The

18     term consists of 130 months as to count 1, 84 months as to

19     count 4, to be served consecutive to count 1.

03:56 20          This sentence will run concurrent to any discharged --

21     undischarged term in Miami-Dade docket F12-026437.  Any

22     restitution hearing will be set separately.  Once restitution

23     is determined, the defendant shall pay 50 percent of UNICOR

24     wages or $25 per quarter.

03:57 25          Once released from incarceration, the defendant shall

```
  1  pay -- shall serve a term of four years' supervised release,
  2  abide by the standard conditions of supervised release, and the
  3  special conditions as outlined in part G, and pay the special
  4  assessment of $200.  That's $100 as to each of the counts of
  5  conviction.
  6          Now that sentence has been imposed, does the defendant
  7  or his counsel object to the Court's findings of fact or the
  8  manner in which sentence was pronounced?
  9          THE DEFENSE:  Your Honor, first of all, just one
 10  correction with respect to the concurrent nature of the State
 11  of Florida case number.  The actual case number is different
 12  from the case number the Court recited.  It's found in
 13  paragraph 12 of the plea agreement which is 12-26437.
 14          THE COURT:  Yeah.  I have F12-026437.  To Probation?
 15          I have like an expert here on state case numbers.
 16  It's just the prefix that's slightly different.
 17          THE DEFENSE:  Case number 12-26437?
 18          PROBATION:  Yes, it's the same.
 19          THE DEFENSE:  12-26437, I thought.
 20          THE COURT:  The 12 is the year.  The 02 was probably
 21  the division letting someone know which judge he appeared in
 22  front of.  They don't have judge numbers -- they don't have
 23  judge names; they have division numbers.  And I think that's
 24  merely who handled that division.  Am I incorrect?
 25          AUSA JOHANNES:  It's the same case, Your Honor.
```

03:57  (line 5)
03:58  (line 10)
03:58  (line 15)
03:58  (line 20)
03:59  (line 25)

1          THE COURT:  Yeah, that's what I thought.

2          THE DEFENSE:  Okay.

3          THE COURT:  Sir, you have the right to appeal the

4    sentence imposed.  Any notice of appeal must be filed within 14

03:59  5    days.  If you are unable to pay the cost of an appeal, you may

6    apply for leave to ay appeal in forma pauperis.

7          THE DEFENSE:  Your Honor, just for purposes of the

8    record I just -- I'm just preserving the issue as to the career

9    offender.

03:59 10          And if I may, Your Honor, also pursuant to the plea

11   agreement, Your Honor, we had that the Court pursuant to

12   paragraph 12 of the plea agreement, the Court was going to also

13   reflect in the J and C credit for time served, and we had a

14   number in there.  My apologies.

03:59 15          AUSA JOHANNES:  Your Honor, I don't know if the number

16   has been confirmed by probation, but I will say the government

17   does concur that he should get credit for the state time he has

18   served already on this case for the same underlying offense.

19          I don't know how the Court wants to write that in the

04:00 20   judgment.  We have had issues with how that's executed in the

21   past.

22          THE COURT:  Well, why don't we do this.  We obviously

23   won't get the judgment and conviction done tonight.

24          Counsel for the defendant and counsel for the United

04:00 25   States, if you could confer with the courtroom deputy in the

1 morning to make sure that the language is appropriate.

2          **THE DEFENSE:**  That will be fine.

3          **AUSA JOHANNES:**  Yes, Your Honor.

4          **THE DEFENSE:**  And respectfully, if I can have the

04:00 5 Court recommend a facility in the State of Florida for

6 Mr. Valhuerdis and also the drug program -- alcohol program

7 actually, drug or alcohol.

8          **THE COURT:**  I'll make that recommendation.

9          **AUSA JOHANNES:**  Your Honor, the government moves to

04:00 10 dismiss counts 2 and 3 of the indictment against this defendant

11 alone.

12          **THE COURT:**  Okay, counsel.  Counts 2 and 3 are

13 dismissed.

14          **THE DEFENSE:**  Thank you, Your Honor.

15

16

17          (Thereupon, the above hearing was concluded.)

18

19                    *          *          *

20

21

22

23

24

25

1

## C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an accurate

4    transcription of the proceedings in the above-entitled

5    matter.

6

8          11/22/2018

9    DATE COMPLETED          GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25